**David BLAND and Raymond Medon, Defendants Below, Appellants,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Feb. 11, 1970.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, for appellant David Bland.

Donald C. Taylor, of Cooch & Taylor, Wilmington, for appellant Raymond Medon.

Francis A. Reardon, State Prosecutor, for appellee.

CAREY and HERRMANN, Justices, and MARVEL, Vice-Chancellor, sitting.

CAREY, Justice.

The defendants below, David Bland and Raymond Medon, were convicted by a jury in Superior Court of burglary and conspiracy to commit burglary. They have appealed, contending that the evidence concerning their alleged participation in the crimes was insufficient to justify their conviction, since it consisted solely of the testimony of alleged accomplices which was so contradictory as to render it unbelievable.

A rather lengthy statement of the evidence is necessary. A family which resides in Wilmington went to the seashore on a Friday afternoon in August, 1968, leaving their house vacant but locked. They came home the following Sunday afternoon and found that the house had been forcibly entered and certain items of personal property taken. They also discovered that two days' mail had been taken from the mailbox, which was then located close to the curb. The Sunday newspaper was in the box, but letters which had been delivered on both Friday and Saturday had been removed. It is obvious that the burglary took place on Saturday night.

The only evidence that these appellants participated in the crime was presented by two witnesses, John Coombs and Francis Wright, both of whom admitted participation in this burglary. Coombs had previously pleaded guilty to breaking and entering, which is a misdemeanor. At the time of this trial, he had not been sentenced.

He said that he had been promised that, if he pleaded guilty to that misdemeanor, the other charges of burglary and conspiracy would be dropped. He admitted the hope of leniency as a result of testifying in this case.

Wright was originally charged with burglary but had, prior to this trial, pleaded guilty to the misdemeanor of unlawful entry with the State's consent. He had not then been sentenced.

The testimony of these two alleged accomplices differs in a number of respects. Neither heard the other testify. Neither of them could recall whether the crime took place on Friday, Saturday, or Sunday night, but thought it was probably Sunday night. This was, of course, incorrect, as we have seen.

Coombs gave this version: he, Wright, Bland and Medon rode around in Coombs' car, commencing about 8:30 p. m. About 10:30 p. m., they stopped the car at the mailbox in front of the house and someone in the car reached out the window and removed the contents of the box. They then rode to a gasoline station in Pennsylvania and perhaps got something to eat, after which they made a telephone call to the house, obtaining the name of the owner from the mail they had taken. The call was to make sure that the house was vacant. They then rode back and parked the car about three hundred yards from the house, and he and Bland broke into the house through a window and removed certain property therefrom. Medon and Wright stayed in the car parked at the corner, although Coombs had previously told the police that he and Medon had broken into the house. The money taken was divided among the four young men.

Wright's version was this: there were six young men in the car. When they first went to the house, Coombs stopped the car some distance away from the house and one of the fellows walked back to the mailbox and got its contents. He could not recall which one this was, but thought it might have been Medon. They then rode around for a short time, without stopping anywhere, and without any discussion of a plan to break into the house. No telephone call was attempted. Coombs drove the car back to a point near the house, and told Wright to drive the car around for a while and come back later. Medon stayed in the car with Wright and asked him to take him home. Wright did so. Medon stayed at home and Wright drove back to the vicinity of the house. He did not know who entered the house, but was positive that four young men, including Coombs and Bland, had walked back in the direction of the house and later returned together to the car. His testimony was somewhat self-contradictory. In his direct examination, he stated that there were four boys involved, but later was very positive that there were six, one of whom was Medon's brother.

Both Bland and Medon emphatically denied any connection whatever with the crime, or receiving any part of the loot. They denied being with Coombs and Wright on Friday, Saturday, or Sunday night of that weekend and testified to their whereabouts at those times. They also presented other witnesses to verify those alibis. Medon's brother was not charged with any offense by the State. He testified that he was not with the others on any of the three nights and his alibi was verified by at least one witness. Wright could not recall who the sixth person was.

One further item should perhaps be mentioned. In the mailbox was a small package of blank checks on which had been printed the name of one of the residents. According to Coombs, on the following Monday, Medon filled out one of these checks, making it payable to Coombs. The money thus obtained ($37.50) was divided among the four participants. Medon denied all knowledge of this. No specific questions were asked of Wright or Bland concerning this check; moreover, the check itself was never offered into evidence.

At the end of the State's case and again at the end of the trial, both defend-

ants moved for judgments of acquittal, which were denied. The trial Judge stated:

"Without deciding whether or not it is still the law that the jury may convict on the uncorroborated testimony of an accomplice, I think the testimony here is corroborated."

We agree that there is ample and convincing proof that the crime took place, but we find no evidence in the record that Bland and Medon participated therein, except the statements of Coombs and Wright. In those states which require corroboration, the usual rule is that corroborative evidence is not sufficient if it merely shows the commission of the offense or the circumstances thereof, and does not connect the defendant therewith. 30 Am.Jur.2d 329. It is likewise the usual rule in such states that testimony of one accomplice is not sufficient corroboration of the testimony of another accomplice; corroboration from an independent source is not dispensed with, regardless of the number of accomplices. 30 Am.Jur.2d 332. We accordingly agree with appellants that there was no corroboration, direct or circumstantial, that these appellants took part in the crime. If the Delaware law required corroboration, this would be the end of the matter. The law in this state, however, is that corroboration is not an absolute necessity. O'Neal v. State, Del., 247 A.2d 207; Joyce et al. v. State, 3 W.W.Harr. 490, 139 A. 254. This rule has been followed repeatedly for many years and we consider it too deeply embedded in the law of this state to permit our changing it by judicial action. We accordingly decline to reverse the holding in O'Neal v. State, *supra,* as requested by appellants.

Despite the lack of any absolute requirement of corroboration of an accomplice's testimony, our Courts have always cautioned juries that, although they have the power to convict solely upon such testimony if firmly convinced of its truth, great care should be exercised in doing so.

■ But our rule does not mean that a trial Judge has no power to remove the case from the jury's consideration in a situation where, for example, there is an irreconcilable conflict in the State's case concerning a defendant's guilt. State v. Lowber, 1 Houst.Cr.Cas. 324; State v. Thomas et al., 6 Terry 385, 75 A.2d 218. On occasion, it may well be the duty of the trial Judge to declare the evidence to be insufficient to warrant a conviction. Cf. State v. Walters, 8 Terry 155, 89 A.2d 135. The present appellants contend that this was such a case. We agree.

■ Comparison of the testimony of the two alleged accomplices shows that their stories differ in several important particulars. They disagree about the number of individuals involved; whether or not plans were discussed; whether Medon was present at all times; the taking of mail from the mailbox; and the alleged telephone call. In the face of these discrepancies, in addition to the defendants' own denials, we have the testimony of the alibi witnesses; denial by Medon's brother that he was with the young men on the evening in question, plus his alibi witness; the fact that Medon's brother was never charged with the offense; and that State's failure to produce the allegedly forged check, or to account for its non-production. Moreover, it is of considerable importance that both of those accomplices had previously been permitted to enter pleas of guilty to lesser misdemeanors.

We quote with approval the following passage from People v. Hermens, 5 Ill.2d 277, 125 N.E.2d 500:

"At common law the uncorroborated testimony of an alleged accomplice was sufficient to warrant a conviction if it satisfied the jury beyond a reasonable doubt. This rule has always been followed and has frequently been pronounced in Illinois. People v. Dabbs, 370 Ill. 378, 19 N.E.2d 175; People v. Cohen, 376 Ill. 382, 33 N.E.2d 593; and see numerous citations, 22 C.J.S. Criminal Law § 810,

p. 1389. It is, however, universally recognized that such testimony has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution, which must always be taken into consideration. Some jurisdictions attach such weight to these weaknesses that the rule has been abrogated by statute, 22 C.J.S. Criminal Law § 810, p. 1391, while those jurisdictions which follow the rule, recognizing the questionable character of such testimony, attempt to restrict the weight to be given to it by statements that it is not regarded with favor, is discredited by the law, should be weighed with care, is subject to grave suspicion, should be viewed with distrust, and that it should be scrutinized carefully and acted upon with caution. * * This court has also said that where it appears that the witness has hopes of reward from the prosecution, his testimony should not be accepted unless it carries with it absolute conviction of its truth. People v. Grove, 284 Ill. 429, 120 N.E. 277."

Under these standards, we think that the evidence in the instant case was insufficient to support a conviction. We are of the opinion that the case is one in which a judgment of acquittal should have been granted.

We take this occasion to express certain views concerning the wording of the charge on accomplice testimony which has been frequently used and which was used in the present case.* It reads as follows:

"The degree of credit to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. Great caution in weighing such testimony is dictated by prudence and good reason. A jury may convict upon the uncorroborated testimony of an accomplice but the better rule is that a conviction should not be had unless such testimony is corroborated in some material part by other direct or circumstantial evidence. However, a jury may convict upon the testimony of an accomplice if it is satisfied from all the facts and circumstances of the case beyond a reasonable doubt that it is true, without any confirmation of such testimony, and in such case it would be their duty to do so. The weight to be given to the testimony of a co-conspirator is for the jury alone and it is to be considered in the view of all the evidence."

To a juror, it probably seems somewhat self-contradictory to say that the jury may convict upon the uncorroborated testimony of an accomplice, yet the better rule is that they should not do so without some corroboration; he perhaps wonders why the Court does not adopt the "better rule." He would hardly understand that the first part of the sentence states the law, and the remainder is little more than a suggestion. The language had its origin in the English Courts, where the Judges have more latitude than their American counterparts in commenting upon the evidence. We think that clearer language can be used.

It seems to us that a charge on this point somewhat along the following lines might be appropriate:

"A portion of the evidence presented by the State is the testimony of admitted participants in the crime with which these defendants are charged. For obvious reasons, the testimony of an alleged accomplice should be examined by you with suspicion and great caution. This rule becomes particularly important when there is nothing in the evidence, direct or circumstantial, to corroborate the alleged accomplices' accusation that these defendants participated in the crime. Without such corroboration, you should not find the defendants guilty unless, after careful examination of the alleged accomplices' testimony, you are satisfied beyond a reasonable doubt that it is true

* Different phraseology was used in Smith v. State, 11 Terry 170, 126 A.2d 142.

and that you may safely rely upon it. Of course, if you are so satisfied, you would be justified in relying upon it, despite the lack of corroboration, and in finding the defendants guilty."

The judgment below will be reversed.